UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DEMETRIUS MINOR,<br><br>        Defendant. | Crim. Action No. 1:22CR401-APM |

**MEMORANDUM IN AID OF SENTENCING**

In the summer of 2021, Demetrius Minor was struggling to get by in an economy ravaged by the pandemic. A small business he had started had faltered. His mother was bedridden and he was (and continues to be) her sole caretaker. Under these trying circumstances, Mr. Minor succumbed to the temptation offered by his cousin, who was more of an older brother figure to him, and gave that cousin firearms Mr. Minor legally purchased in exchange for money. Over the course of the summer and fall of 2021, Mr. Minor admits he transferred firearms in exchange for money. Prior to these unlawful sales, Mr. Minor had lived a law-abiding life. Mr. Minor voluntarily stopped his offense conduct entirely following a consensual interview with agents on December 3, 2021, six months prior to his arrest. Following his arrest on August 2, 2022, Mr. Minor was placed on strict conditions of release with which he has complied. Mr. Minor has maintained contact with his supervision officer; he has tested negative for all drugs; and for the past year, he worked at Papa Johns, where he was a trusted and valued employee. In addition, Mr. Minor remains the full-time caretaker to his mother, Maunette Minor.

Mr. Minor's criminal conduct was distant and relatively short-lived. He ceased his conduct entirely 18 months ago, having recognized the seriousness of his actions once he was approached by law enforcement. Furthermore, he has amply demonstrated he can succeed on supervision. Under these circumstances, a sentence of probation with a condition of home detention is sufficient and no greater than necessary to achieve the goals of sentencing.

**II. Background**

Mr. Minor was arrested on August 2, 2022, and charged by complaint with offenses related to the transfer of firearms to his co-defendant, Donald Willis. He was subsequently indicted alongside Mr. Willis and charged with one count of engaging in the business of dealing in firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A), one count of illegal interstate transfer of firearms, in violation of 18 U.S.C. § 922(d)(1), one count of sale of a firearm to a convicted felon, in violation of 18 U.S.C. § 922(d)(1), and one count of conspiracy, in violation of 18 U.S.C. § 371.

Prior to his arrest, ATF officers interviewed Mr. Minor three times, each time without the presence of counsel. Mr. Minor stopped his offense conduct altogether after the first interview with agents, which took place on December 3, 2021. Following his arrest eight months after his first conversation with law enforcement, Mr. Minor was placed on High Intensity Supervision and GPS monitoring. Following six months of compliance, this Court removed GPS monitoring as a condition. *See* ECF. No. 40. On March 16, 2023, Mr. Minor pleaded guilty to count one of the indictment and this

Court placed him back on GPS monitoring. Mr. Minor has remained strictly compliant with all his conditions of release since his arrest one year ago.

## II. Relevant Sentencing Considerations

The defense has reviewed the final presentence report and agrees that the correct advisory guidelines range is 30 to 37 months. However, for the reasons explained below, the defense submits that a variant sentence of six months of home confinement as a condition of probation will meet the goals of 18 U.S.C. § 3553(a) and is sufficient but not more than necessary in this case. As the Supreme Court has emphasized, "the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (internal quotations and citation omitted).

### A. Mr. Minor's life story is one marked by the challenge of his father's absence and by his work ethic and commitment to his mother, who has significant health issues.

Demetrius Minor was born in 1991 in Silver Spring, Maryland. His father was absent throughout his childhood and died when Demetrius was 20 years old. While Demetrius does not like to speak about his father's absence, when asked about it, it is clear that what he perceived as his father's abandonment has hurt him deeply.

Demetrius's mother, Maunette, raised Demetrius and his brother on her own until she met the man that Demetrius considered to be a stepfather. Maunette raised the boys in a loving home and as he explains in his letter to the Court, Demetrius is very close with his mother to this day. He is also close to his brother, whom he considers to be one of his best friends.

3

 **Demetrius and his brother outside their apartment in Silver Spring, Maryland**.

Demetrius's mother has significant health issues, which caused her to have intermittent employment when Demetrius was a child. She is currently unemployed and bedridden due to her poor health and Demetrius is her primary caregiver. As her caregiver, Demetrius administers his mother's medications, changes her bedpan, gives her meals, and takes her to and from doctor and hospital visits. Mr. Minor's close friend writes, "he cares for his mother primarily and ensures all of her needs are met all at times, he often spends time worrying about everyone before he takes time to worry about himself… "[1]

Demetrius graduated from high school in 2012. One of his teachers took the time to write the Court about her experience teaching Mr. Minor, writing that it "was an honor to teach Demetrius and see him finish high school."[2] After high school, Demetrius attended Job Corps in Kentucky. Following Job Corps, Mr. Minor worked in various retail positions. In 2014, he also started working on an as-needed basis

---

[1] Letter of Amanda Gushard-Edwards, attached hereto as part of Exhibit 2.
[2] Letter of Rachel Hijazi, attached hereto as part of Exhibit 2.

4

doing snow removal. In early 2019, Mr. Minor embarked on a small business buying iphones and other small electronics from Facebook marketplace or Craig's List and reselling them. He would buy the phone new or used, fix it up if it needed fixing, and then sell it for a small profit. Mr. Minor was making decent money selling the phones for a few months.[3] Below is a screen shot reflecting some of Mr. Minor's sales.[4]



---

[3] Mr. Minor's business model was not uncommon. In 2018, just two years into its existence, Facebook marketplace already had 800 million users. Suzanne Bearne, *How de-cluttering grew Facebook Marketplace to 1bn users*, BBC News (July 8, 2021), https://www.bbc.com/news/business-57733724. The market for used electronics was so big in 2019 that news sources published articles explaining how to start businesses "flipping" - or fixing - electronics. *See e.g.* Jed Mahrle, *Everything You Need to Know to Make Money Flipping iPhones* (June 13, 2009), https://medium.com/@jedediahmahrle/everything-you-need-to-make-money-flipping-iphones-jed-mahrle-748e11b7639f.

[4] An "unlocked iphone" is a phone that is not tied to any one phone company, which allows users to use the phone with any cellphone network if the user has a service plan with that company. *See* Sam Costello, Everything You Need to Know About Unlocked iphones, Lifewire (December 29, 2020); https:// www.lifewire.com/unlocked-iphone-4-faq-1999717.

When the country went on lock down during the pandemic, the price of electronics increased, and his business dried up. For months before his offense conduct, Mr. Minor was unemployed.

Following his arrest, Mr. Minor immediately got a job at Papa John's and worked there until recently, when he had to pause work due to an illness that caused his leg to swell.[5] Though he is currently unable to work due to the edema, he is slated to start working at a Dominoes location in Germantown, Maryland, when he recovers.

Mr. Minor has never abused drugs or alcohol. He has never been treated for mental issues. He has obtained a high school diploma. As for his health, he weighs over 500 lbs., and he takes medication for hypertension and asthma.[6] Counsel submits that Mr. Minor's physical condition is a valid basis for a downward variance.

### B. The extenuating circumstances that led to Mr. Minor's conduct, its relatively short duration, and voluntary termination are mitigating.

Mr. Minor's fledgling business—as is true of so many businesses—took a hit during the pandemic when the price of phones and other electronics increased. Mr.

---

[5] Mr. Minor was seen at Germantown Primary Care Associates on July 6, 2023, for swelling in his leg. The discharge notes advises "patient cannot begin working until he is medically cleared to do so." On July 7, 2023, he went to the emergency room and was diagnosed with cellulitis, an infection in his leg.

[6] In light of his physical condition, the Court may find USSG §5H1.4 (Physical Condition) as a potential ground for a downward departure. Under USSG §5H1.4, "an extraordinary physical impairment may be a reason to depart downward; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment." Indeed, due to his size, Mr. Minor has labored breathing and encumbered mobility, which would make Mr. Minor's accommodation in custody challenging. Additionally, Mr. Minor was recently treated in the emergency room for cellulitis, which manifests itself into debilitating swelling and pain in his leg.

Minor was left unemployed and had no safety net to fall back on. Mr. Minor knew Donald Willis from growing up—Mr. Willis's sister is Mr. Minor's mother's sister. The women were very close and the two boys were raised like brothers. Mr. Willis is ten years older than Mr. Minor, and Mr. Minor had always looked up to him.

Through a conversation in early 2021, Mr. Willis knew that Mr. Minor had legally purchased a firearm in Maryland. Mr. Willis expressed that he was interested in purchasing the firearm. Mr. Minor believed this presented a temporary solution to his financial struggles – he could purchase and resell firearms to Mr. Willis in exchange for approximately $200 per gun. From April 2021 to November 2021, Mr. Minor purchased firearms at various federal firearms license dealers (FFL) in Maryland that he resold to Mr. Willis and occasionally, to an associate of Mr. Willis.[7]

Mr. Minor readily accepts responsibility for his bad judgment and is prepared to accept the consequences. His offense conduct was an aberration from his steady law-abiding course, yet he has demonstrated that he is committed to making better

---

[7] Notably, Mr. Minor purchased 25 firearms at Engage Armament between April 2021 and September 2021. Though these purchases should have raised a red flag with the FFL, the owners of the FFL will escape liability for the patently irresponsible sales altogether. Meanwhile, the government is requesting a significant sentence for Mr. Minor, a disadvantaged Black man who legally purchased the firearms and later transferred the firearms to his cousin in exchange for a small profit. While the defense does not seek to minimize Mr. Minor's conduct, it is worth pointing out that the well-resourced upstream sellers of the firearms, who literally pump guns into urban communities like D.C. for profit, will not receive any consequence for their critical roles in disseminating guns into the community. Meanwhile, the government appears to lay all the blame for gun violence on Mr. Minor: "Criminals can get guns because of the unfeeling actions of individuals like the defendant. . . " Gov. Memo. at 6. Counsel respectfully submits that this disparate treatment militates in favor of a non-incarceratory sentence for Mr. Minor, who has since made significant strides in his life.

choices by complying with strict conditions of release and finding legitimate work as a pizza delivery driver. His former Papa John's manager wrote that Mr. Minor "always showed up for his shift and he would always come early if I needed him to. He repeatedly asked for more hours and to take on more responsibilities."[8]

Though short-sighted, Mr. Minor acted out of financial stress when he could not get his business off the ground during a period of upheaval for the entire country. His conduct was time-limited and ended before his arrest. Though delivering pizzas is neither easy nor lucrative, he has not repeated his errors. These circumstances weigh heavily in favor of a variant sentence.

### C. The requested sentence will achieve the goals of sentencing.

The requested period of probation and home confinement, in addition to the life-long collateral consequences that attend to a felony conviction, would vindicate the goals of sentencing codified at 3553(a)(2) – namely, imposition of a sentence that provides for both specific and general deterrence, and that provides "just punishment." *Gall v. United States*, 552 U.S. 38, 50 n.6, 53 (2007). A lengthy sentence is not needed here to deter Mr. Minor from committing any future crime. Nor is imposing such a sentence on Mr. Minor necessary to serve the purpose of general deterrence.

### 1. The requested sentence is in step with other sentences imposed in cases similarly situated to Mr. Minor's.

The PSR cites Judiciary Sentencing Information (JSIN) of 463 defendants under 2K2.1 whose final offense level was 19 and whose criminal history was I. The

---

[8] Letter of Kyra Hawkins.

government also discusses over 8,000 cases in which defendants were sentenced under 2K2.1. *See* Gov. Memo at 12. Guideline 2K2.1 covers a wide swath of firearms offenses. However, when one narrows in on Mr. Minor's offense of conviction, different results emerge. During the last five fiscal years the JSIN showed 101 cases in which the sole primary offense of conviction was §922(a)(1)(A). Of these 101 cases, seven cases resulted in an offense level 19 and a criminal history category I—therefore *seven cases* resulted in the same guideline range applicable to Mr. Minor. Of these seven cases, two sentences of probation were imposed. In another case, the defendant received a split sentence (six months of imprisonment plus six months of home confinement). Three of the seven cases resulted in below-guidelines' sentences and only one was sentenced within guidelines.[9] Of the 101 cases in which the statute of conviction was 922(a)(1)(A), 70 defendants received below-guidelines sentences. These other 922(a)(1)(A) cases—combined with the unique facts of Mr. Minor's case and his history and characteristics—show that a probationary sentence with a condition of home confinement is appropriate and would not result in unwarranted disparity.

### 2. A sentence of probation with home confinement provides sufficient deterrence and just punishment.

For Mr. Minor, who had few and minor interactions with the criminal legal system prior to this case, and who foolishly engaged in unlawful conduct out of financial strain, a sanction from this Court need not be incarceratory to deter him

---

[9] See attached chart of cases of similarly situated cases, Exhibit 1.

from future wrongdoing. In assessing the need for additional deterrence and just punishment, this Court should consider the life-long impact a felony conviction will have on Mr. Minor. District judges have recognized that the life-long, damaging impact of a felony conviction can be relevant to sentencing. For example, this Court has recognized the punishing impact of a conviction alone when it stated:

> People are all very quick to suggest that the only real punishment is a jail sentence, and it's just not true. People can suffer in many different ways and do suffer in many different ways as a result of their conduct and that is something every judge, at least on this court, I believe, understands, and takes into account when they're fashioning the appropriate sentence.[10]

Similarly, in imposing a variant probationary sentence, Judge Frederic Block of the Eastern District of New York issued a written opinion on the relevance of collateral consequences to his sentencing determination and urged that judges "consider such consequences in rendering a lawful sentence." *United States v. Nesbeth*, 188 F. Supp.3d 179 (E.D.N.Y. 2016). Judge Block wrote:

> There is a broad range of collateral consequences that serve no useful function other than to further punish criminal defendants after they have completed their court-imposed sentences. Many—under both federal and state law—attach automatically upon a defendant's conviction. The effects of these collateral consequences can be devastating … Myriad laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy. These restrictions amount to a form of civil death and send the unequivocal message that "they" are no longer part of "us."

---

[10] *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at pg. 29.

188 F.Supp.3d at 180 *(internal quotations, alterations, and citations omitted)*. In *Nesbeth*, the defendant was also a first offender, convicted of importation of drugs. Though that defendant's guideline range was 33-41 months, Judge Block "rendered a non-incarceratory sentence. . . in part because of the number of statutory and regulatory collateral consequences in the balancing the 18 U.S.C. § 3335(a) factors." *Id.* at 180. Mr. Minor will undoubtedly experience the same collateral consequences recognized by this Court and Judge Block. In fact, Mr. Minor already begun to experience those consequences because due to his conviction he is not legally permitted to live with his mother, who lives in public housing.[11] He will be blocked from certain jobs and public housing. Importantly, he will be unable to legally purchase firearms so it will be impossible for him to repeat his offense conduct. Finally, a lengthy period of continued supervision is a punishment in and of itself. *United States v. Haymond*, 139 S. Ct. 2369, 2380 n.5 (2019) ("[T]he sword of Damocles hangs over a defendant every time he wakes up to serve a day of supervised release.")(internal citations ommitted); *Gall v. United States*, 522 U.S. at 48 (2007) (noting that even a non-custodial sentence imposes serious restrictions on one's liberty and constitutes punishment, not a "free pass").

Mr. Minor's conduct since he was first interviewed by agents over 18 months ago shows that he will not choose a criminal path again. This assertion is supported by U.S. Sentencing Commission's data, which reflect that a person in Criminal History Category I presents a minimal risk of reoffending. In a study on recidivism,

---

[11] PSR, paragraph 60.

the Commission found that offenders with zero criminal history point have a rate of reconviction of between 3 and 5 percent.[12] Moreover, it is often presumed that incarceration is necessary to achieve deterrence, and that the more incarceration imposed, the greater the deterrent effect. To the contrary, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[13] In brief, the most effective deterrent is the certainty of punishment, rather than its length. *See, e.g.*, Nat'l Resource Council, The Growth of Incarceration in the United States, at 131 (2014); DOJ, Nat'l Instit. of Justice, Five Things About Deterrence ("Sending an individual convicted of a crime to prison isn't a very effective way to deter crime."). This conclusion is born out in firearms case as well. A Sentencing Commission report on firearms recidivism conducted in 2021 found that "the data did not show a clear relationship between sentence length and recividism."[14] Thus, the prosecution and conviction of Mr. Minor, and his sentence to *any* period of supervision and confinement, will achieve effective general deterrence for other similarly situated defendants. Indeed, for this category of potential

---

[12] *See Recidivism and the "First Offender,"* United States Sentencing Commission, May 2004, available at https://www.ussc.gov/research/researchpublications/recidivism-and-first-offender.

[13] Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

[14] USSC, *Recidivism of Federal Firearms Offenders Released in 2010* 30 (2021), https://bit.ly/3ZZpGiQ.

offenders, it is the knowledge of certain consequences – including arrest and supervision – that is the most effective deterrent to following the path that Mr. Minor followed when his trusted older brother-figure raised the idea of purchasing guns for him.

Finally, recognizing the mitigating circumstances of this case and imposing a sentence that will permit Mr. Minor to continue to move forward, work, and care for his mother would both foster respect for the law and constitute just punishment. This offense occurred now almost two years ago. Mr. Minor entirely ceased the conduct– also almost two years ago. Mr. Minor has demonstrated that he is not a dangerous person that needs to be taken off the streets. He has been working as a pizza delivery driver, he has been caring for his mother, and he has adhered to pretrial conditions without fail. It goes without saying that if he is locked up, he will not be able to work. He will need to start over again when he is released, this time with a felony conviction on his record. While he is locked away, his mother will lose her only caretaker. It stands to reason that derailing Mr. Minor from his current positive path could have negative consequences for not only Mr. Minor, but his family and community. It is in all the parties' interest, including the public's, that Mr. Minor be able to continue to succeed at his job, support his mother, and not have to re-start his life all over again after a period of incarceration.

## Conclusion

For the reasons set forth herein, Mr. Minor, through counsel, respectfully submits that sentence of supervision with conditions the Court deems appropriate, is sufficient but no greater than necessary to achieve the goals of sentencing.

Respectfully Submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER


_____/s/_____
ELIZABETH MULLIN
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500